**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | |
|---|---|
| CHARLES R. BLAND, | |
|      Plaintiff, | |
| v. | Civil Action No. 1:17-cv-01025-STA-egb |
| THE CARLSTAR GROUP, LLC, | |
|      Defendant. | |

---

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Charles R. Bland filed this action against his former employer, The Carlstar Group, LLC ("CSG"), alleging that Defendant discriminated against him in violation of his rights under the Americans with Disabilities Act (as amended), 42 U.S.C. § 12101 *et seq.* ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("ADEA"), and the Tennessee Human Rights Act , Tenn. Code. Ann. § 4–21–101 *et seq.* ("THRA").[1] (ECF No. 1.) Defendant has filed a motion for summary judgment (ECF No. 33), Plaintiff has filed a response to the motion (ECF No. 35), and Defendant has filed a reply to the response. (ECF No 41.) Plaintiff was granted permission to file a sur-reply (ECF No. 45), and Defendant was granted permission to file a sur-sur-reply. (ECF No. 49.) For the reasons set forth below, Defendant's motion is **DENIED**.

---

[1] Plaintiff has stipulated to the dismissal of his discrimination and retaliation claims under § 504 of the Rehabilitation Act. (ECF Nos. 23, 24.) He has also stipulated that his retaliation claims under the ADEA, ADA, and THRA should be dismissed. (ECF Nos. 36, 37.)

<u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must review all the evidence and draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

<u>Statement of Material Facts</u>

Local Rule 56.1(a) requires that any motion for summary judgment be "accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial."[2] Any party opposing summary judgment must respond to each fact

---

[2] Local Rule 56.1(a) provides as follows:

stated by the movant by agreeing that it is undisputed, agreeing that it is undisputed for purposes of ruling on the summary judgment motion only, or by demonstrating that the fact is disputed, with specific citations to the record.[3]  "Failure to respond to a moving party's statement of material facts ... shall indicate that the asserted facts are not disputed for purposes of summary judgment."  LR 56.1(d).  Rule 56(e) of the Federal Rules of Civil Procedure also provides that if

---

(a) Moving Party. In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Fed. R. Civ. P. 56 shall be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record. If the movant contends that the opponent of the motion cannot produce evidence to create a genuine issue of material fact, the proponent shall affix to the memorandum copies of the precise portions of the record relied upon as evidence of this assertion.....

[3]  Local Rule 56.1(b)  provides as follows:

(b) Non-moving Party. Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:(1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed. Each disputed fact shall be filed with any memorandum in response to the motion. The response must be made on the document provided by the movant or another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant. In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant. In addition, the non-movant's response may contain a concise statement of additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

a party "fails to properly address another party's assertion of fact ... the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

The purpose of a statement of facts is "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson*, 477 U.S. at 247–48). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the record and show that the fact fails to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support the purported fact. Fed. R. Civ. P. 56(c)(1).

As the non-moving party, Plaintiff was required to respond to Defendant's statements of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local R. 56.1(b). Additionally, Plaintiff may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). When a plaintiff asserts that a genuine dispute of material fact exists, he must support his contention with a "specific citation to the record." Local R. 56.1(b).

If Plaintiff fails to demonstrate that a fact is disputed or fails to address Defendant's statement of facts properly or if Defendant fails to address Plaintiff's statement of additional facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. Fed. R. Civ. P. 56(e)(2); *see also* Local R. 56.1(d) ("Failure to respond to a moving party's

statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.").

Both parties have complained about the opposing party's response to the other party's statement of facts, and the Court finds the complaints to be meritorious. Defendant argues that Plaintiff has "present[ed] detailed argument well beyond merely showing a disputed issue of fact," (Def's Reply p. 1, ECF No. 41), and Plaintiff contends that Defendant "violated" Local Rules 56.1(b) and 56.1(c) by not properly responding to his statement of additional facts. (Pl's Sur-Reply p. 1, ECF No. 45.) Neither party seems to understand the correct way to respond to a statement of facts despite the explicit instructions in Rule 56.1. A response to an opponent's statement of fact is not the place for additional facts or for argument. *See Boyd v. Reed Landscaping, Inc.*, 2016 WL 5404765 at *1 (M.D. Tenn. Apr. 26, 2016), *rep. & rec. adopted in part, rejected in part*, 2016 WL 5404642 (M.D. Tenn. Sept. 27, 2016) ("The parties' concise statement of facts has been of little assistance to the Court since the statements themselves are for the most part not concise statements of facts, but rather, compound statements including statements of judgment, opinion, and legal argument. The responses for the most part have been lengthy arguments and objections. At times, rather than simply saying 'denied' with a citation to the record, the responding party has gone on for several paragraphs, making a legal argument. None of this helps the Court determine what facts are in dispute and which are not.")

Defendant is correct that Plaintiff's response to its statement of facts (ECF No. 35-1) is replete with improper argument. As this Court stated in a previous case, "Argument in responses to statements of material facts clouds issues." *Maverick Grp. Mktg., Inc. v. Worx Envtl. Products, Inc.*, 99 F. Supp. 3d 822, 827 (W.D. Tenn. 2015). However, despite Plaintiff's

"clouding of the issues" by inserting argument and unsupported inferences in his response to Defendant's statement of facts, the Court is able to discern factually based disputes and whether those disputed are material and will make its decision accordingly. To the extent that Plaintiff has presented any facts in his response that are not material or relevant to the issues presented by Defendant's motion, the Court will disregard those facts except as necessary to provide context or background. *C.f. Hillman v. Shelby Cty.*, 2012 WL 681778 at *1 (W.D. Tenn. Feb. 29, 2012) ("[C]ourts in the Western District of Tennessee do not strike inadmissible portions of affidavits; instead, they disregard the inadmissible testimony in their evaluation of the summary judgment motion before them.") The Court will do likewise with Defendant's responses to Plaintiff's statement of additional facts since Defendant also has failed to comply with the requirements of Local Rule 56.1 by including argument and extraneous material in its responses.

The Court finds that, for purposes of deciding this motion only, there is no genuine dispute as to the following material facts, unless otherwise noted.

Prior to February 4, 2016, Plaintiff was a fifty-five year-old maintenance technician working for CSG. Plaintiff worked for CSG for almost six years without any write-ups or reprimands in his personnel file.

During the relevant time period, Plaintiff worked for Defendant CSG as a maintenance technician at CSG's Jackson plant. As a maintenance technician, Plaintiff repaired machines.[4]

Plaintiff has peripheral artery disease which caused him some difficulty walking.[5] Plaintiff was on FMLA leave from early September 2015 until approximately October 19, 2015.

---

[4] Plaintiff disputes this statement to the extent that it implies that his sole responsibility was repairing machines and that he was attempting to repair rather than adjust press 72 on the day in question. (Pl's Resp. No. 2, ECF No. 35-1.) The Court does not read Defendant's statement as having any such implication.

When Plaintiff called the Human Resources office in October 2015 and reported that his surgeon had released him to come back to work and that he was ready to return to work, he was told, "We'll call you and let you know when to come back." On the day Plaintiff would have been terminated had he not returned to work after his FMLA leave, he returned, even though CSG had not called him and told him he could return, and CSG's time card machine would not accept his time card anymore. After receiving Plaintiff's clearance to come back to work, Shea Harris in Human Resources emailed the doctor's office to double check Plaintiff's medical record. The day after Plaintiff returned to work, Harris asked Plaintiff, "Didn't I tell you that we would call you and let you know when to come back to work?" CSG had not been requiring fit for duty physicals prior to requiring one for Plaintiff's return to work in October 2015.[6]

Soon after Plaintiff had returned from his FMLA leave, Matthew White, the first shift team lead maintenance supervisor, said to him, "Well, Chuck, I figured you'd probably think about disability or something. I didn't think you'd probably show back up out here."[7]

It was the perception of some of Defendant's employees and management that Plaintiff was having trouble walking around the plant after he returned from his surgery in the fall of 2015. Human Relations Manager Jeff Gaston assumed that it would take Plaintiff longer to

_____

[5] Plaintiff disputes this to the extent the statement implies that he could not perform his job adequately. (*Id.* at No. 3.) Again, the Court reads no such implication into Defendant's statement. Moreover, for the purpose of the motion, Defendant has conceded that Plaintiff has established a prima facie case under the ADA. (Def's Reply p. 27, ECF No. 41.)

[6] Defendant does not dispute these statements but argues that the statements do "not support any inference of discriminatory animus beyond a mere colorable argument without significant probative value." (*Id.* at p. 28.)

[7] Defendant does not dispute this statement but, instead, argues that it was an ambiguous, isolated remark. (*Id.* at p. 27.)

respond to maintenance calls because it appeared to Gaston that Plaintiff was having trouble walking through the plant after his surgery while Matthew White had no knowledge of Plaintiff's taking longer to respond to maintenance calls. Plaintiff's health did not impact his ability to perform his job after his return from surgery in October 2015.[8]

Not long after Plaintiff returned from his FMLA leave, Ronnie Owens, the engineering services manager at CSG, offered him the option to switch from his maintenance technician position to a mold technician position because Owens believed the mold technician position did not require as much walking. The mold technician position paid approximately $5.00 less than Plaintiff's maintenance technician position. Owens's offer to allow Plaintiff to switch positions was voluntary. During this conversation, Owens talked to Plaintiff about his age, the condition of his health, and his inability to get another job at his age and with his health condition.[9]

After considering Owens's offer for several days, Plaintiff declined the offer. The primary reason that he declined Owens's offer was that he "couldn't afford to take the five dollar an hour pay cut." If the pay had been the same, Plaintiff probably would have taken the mold technician position.

CSG has a lock-out/tag-out ("LOTO") policy.[10] Under CSG's policy, a machine must be locked-out/tagged-out before an employee performs work on the machine if the employee would

---

[8] Defendant does not dispute these statements as they relate to whether Plaintiff was disabled. As previously noted, at this juncture, Defendant does not contest Plaintiff's prima facie case under the ADA. (*Id.*)

[9] Defendant contends that any such statements were isolated and ambiguous. (*Id.* at p. 28.)

[10] Plaintiff does not dispute that Defendant has such a policy but points out that this statement "ignores the fact that the LOTO Policy has an exception that applies to the adjustment [Plaintiff] made to press 72 on February 4, 2016." (Pl's Resp. No. 12, ECF No. 35-1.) Plaintiff's argument

be exposed to a risk or danger when working on the energized machine.[11]  Locking out a machine de-energizes the machine's energy source and prevents an unexpected start-up or cycling while the employee making the repair is in direct contact with the machine.[12]

On February 4, 2016, Plaintiff was sent to press 72 because the tire mold was not closing completely, causing tires to not be molded correctly.  The mold was un-level and needed to be leveled.  Plaintiff used a two to two-and-a-half-foot pipe wrench to adjust the joy nut that was attached to the shaft of the gearbox, which in turn adjusted the platen height of the mold.  Plaintiff did not have press 72 locked-out.[13]  Plaintiff called his supervisor, Matthew White, and asked for help.

After ascending on the scissor lift with Plaintiff, White walked over onto the platform of press 72, where Plaintiff had previously been standing, and Plaintiff stayed on the scissor lift.

---

is not responsive to Defendant's statement of fact, and Defendant's statement as to its policy is deemed to be undisputed.

[11]  Plaintiff again attempts to argue his case in his response to this statement by pointing out that the LOTO policy does not apply to adjustments.  (*Id.* at No. 13.)  However, Plaintiff does not appear to dispute Defendant's actual statement that the policy applies "if the employee would be exposed to a risk or danger when working on the energized machine."  (Def's St. Mat. Facts No. 13, ECF No. 33-3.) .

[12]  Plaintiff does not dispute the statement to the extent that it "is broadly saying that locking a machine out de-energizes the machine" but does dispute it to the extent that the statement contains any implication that Plaintiff was repairing the machine as opposed to adjusting it.  (Pl's Resp. No. 14, ECF No. 35-1.)  The statement contains no such implication.

[13]  In his response to this statement, Plaintiff admits that he did not have press 72 locked-out.  (*Id.* at No. 19.)  Any argument contained in his response as to whether press 72 was being repaired or adjusted and/or whether other employees did not lock-out press 72 during the relevant events is not appropriate as a response to this statement of fact.

While at press 72, White learned that Plaintiff had not locked-out/tagged-out press 72.[14] White attempted the same adjustment that Plaintiff had attempted, and White did so without being locked-out/tagged-out.[15]

Corey McLemore, then acting maintenance supervisor and White's immediate supervisor, and Owens were notified that Plaintiff had not locked-out/tagged-out press 72. Owens immediately notified Jeff Gaston of the incident.

At Owens's request, White, McLemore, and Plaintiff each provided a written statement about what happened.[16]

Because he is not an expert on the LOTO Policy, Gaston relied upon Plaintiff's supervisors, White, McLemore, and Owens, to determine if Plaintiff violated CSG's LOTO Policy.

Training records showed that Plaintiff had attended (1) a September 2013 LOTO training specifically for maintenance technicians and (2) a plant-wide January 2014 LOTO training. The training records also indicated that Plaintiff participated in a periodic inspection audit on the LOTO Policy on July 24, 2014. At the July 24, 2014, audit, McLemore went over the appropriate LOTO procedure and demonstrated the procedure on press 73, which is identical to

---

[14] Again, the Court has ignored the argument and additional facts present by Plaintiff in his response to this statement of fact. (*Id.* at No. 21.)

[15] Defendant does not dispute this statement but argues that this statement and others presented by Plaintiff merely show that Defendant may have made mistakes in its investigation but do not establish that Defendant did not "reasonably and honestly believe" that Plaintiff had violated the LOTO policy. (Def's Reply p. 26, ECF No. 41.)

[16] Plaintiff disputes whether any actions taken by Defendant in connection to the relevant events actually constituted an "investigation." (Pl's Resp. Nos. 24 & 25, ECF No. 35-1.)

press 72.  At the July 24, 2014, audit, Plaintiff understood McLemore and did not have any questions.

The training documents that CSG relied on to terminate Plaintiff contained exceptions to the LOTO policy, but the decision makers did not consider the exceptions before terminating him.[17]  The person who trained Plaintiff as to how to perform an adjustment on machines like press 72 instructed Plaintiff to do adjustments without locking-out/tagging-out.

Had CSG investigated the incident, it would have learned that (1) Plaintiff was trained to make adjustments without locking-out/tagging-out according to a policy exception that applied when the coupling was not removed and (2) White made the same adjustments as Plaintiff had made.[18]  Although CSG was on notice that White performed the same adjustment on press 72 that Plaintiff had performed and neither man was locked-out/tagged-out, CSG did not investigate White's actions like it did Plaintiff's actions.  White was not disciplined nor terminated for a LOTO violation concerning this incident.

Although Plaintiff believed that the exception applied to the adjustment he made on press 72, after he was called to the office, he assured CSG that he would lock-out/tag-out that press in the future when he was performing adjustments.

Gaston informed Plaintiff of his termination on February 5, 2016.  CSG did not follow its graduated discipline policy when it terminated Plaintiff.

---

[17]  *See* footnote 14.

[18]  *See id.*

In defense of Plaintiff's termination, CSG claimed that it had to terminate Plaintiff because its LOTO policy was a zero tolerance policy.[19] The LOTO policy is actually not a zero tolerance policy. The LOTO policy applies equally to every employee no matter what position is held by that employee.

CSG has not terminated other employees who were written up for violations of the LOTO policy. Larry Ballard was just given a warning for his LOTO violation; David Bucks was terminated, not for his LOTO violation, but because he had been warned before and continued violating the LOTO policy; Brent Jones received a warning for his first LOTO violation and was not terminated until after his second violation; and David Bucks' subordinates were not terminated for their LOTO violations.[20]

CSG replaced Plaintiff with Cameron Laws who is in his early to mid-twenties, was not known to be disabled, and had numerous write-ups in his personnel file. Matthew White was in his thirties as of February 4, 2016, and was not known to be disabled.[21]

<u>Discrimination Claims</u>

Plaintiff claims that he was terminated because of his age and perceived disability in violation of the ADA, the ADEA, and the THRA. The parties have addressed all these claims together, and the Court will do likewise. The framework developed in *McDonnell Douglas*

---

[19] In a footnote, Defendant claims that it only began enforcing the LOTO policy when Thomas Lents was hired as the new environmental health safety manager in March 2013. (Def's Reply p. 26 n. 23, ECF No. 41.) .

[20] Although Defendant argues that Plaintiff has not adequately shown which alleged comparators were similarly situated, it has not disputed these facts for the purpose of this motion. (*Id.* at p. 27.)

[21] (*Id.*)

*Corp. v. Green*, 411 U.S. 792 (1973), and modified by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), governs claims lacking direct evidence of discrimination[22] as in the present case. *See generally Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811–12 (6th Cir. 2011) (discussing when a court should analyze a claim under *McDonnell Douglas/Burdine*). Using this framework,

> "[o]n a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir.2000). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that a prima facie case of discrimination has been established. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). The defendant must then offer sufficient evidence of a legitimate, nondiscriminatory reason for its action. *Id*. If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Id.*[23]

*Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007).

The plaintiff's burden to demonstrate pretext in the final step "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. In evaluating pretext, the court must consider all evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage. *See Peck v. Elyria Foundry Co.*, 347 F. App'x 139, 145 (6th Cir. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

---

[22] "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251–52).

[23] Courts use the *McDonnell Douglas/Burdine* framework for claims brought under the ADA, ADEA, and the THRA. *See Macy*, 484 F.3d 357, 363 (6th Cir. 2007) (ADA); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) (ADEA); *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006) (THRA).

A plaintiff "can establish pretext by demonstrating either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 319 (6th Cir. 2007) (internal quotations omitted); *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (accord). These "categories" are "a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citation omitted). "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)

A jury may infer discrimination from persuasive proof that a defendant's explanation is unworthy of credence. *Reeves v. Sanderson Plumbing, Co*., 530 U.S. 133, 147 (2000). Thus, "a plaintiff's prima facie case, combined with disbelief of the defendant's proffered reasons for the negative employment action, permits a finding of retaliation [or discrimination] by the factfinder." *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 545 (6th Cir. 2008 (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003), and *Kline v. Tenn. Valley. Auth.*, 128 F.3d 337, 347 (6th Cir. 1997)).

In the present case, Defendant concedes that Plaintiff has established a prima facie case for the purpose of deciding this motion, and Plaintiff acknowledges that Defendant has articulated a legitimate, non-discriminatory reason for his termination, i.e., violation of a safety rule, specifically violating CSG's LOTO Policy on February 4, 2016, when Plaintiff worked on press 72 without locking-out/tagging-out the machine. Accordingly, to defeat summary judgment, Plaintiff must point to evidence in the record from which the trier of fact could find

that this reason is pretextual.  Plaintiff contends that the trier of fact could find pretext based on the following evidence, and the Court agrees.[24]

Plaintiff was fifty-five years old and had recently taken FMLA leave for surgery on his leg related to peripheral arterial disease at the time of the relevant events.  Prior to his termination, he had not been the subject of any disciplinary action by CSG.

There is evidence in the record from which the trier of fact could find that Plaintiff was merely making an adjustment to press 72 as opposed to a repair and that "adjustments" were not subject to the LOTO policy. (LOTO Procedure, 8.0 EXCEPTION TO LOCKOUT PROCEDURE § 8.1, PageID 1106, ECF No. 33-7.)  The work order itself stated that an "adjustment" was needed.  (Pl's Exhibits, PageID 1546, ECF No. 35-3.)  Plaintiff testified in his deposition that he was told that the press needed to be adjusted.  (Pl's Dep. PageID 167, ECF No. 33-4.)  The tools he took with him were used to adjust the press.  (*Id.* at PageID 180.)

Plaintiff further testified that he turned the joy nut on the shaft of the gearbox to adjust the gearbox.[25]  (*Id.* at PageID 183, 186.)  Plaintiff testified that he had received training to do the

---

[24]  Plaintiff has acknowledged that his citations to the record could have been in a better format and has offered to replace the citations.  (Pl's Sur-Reply p. 8, ECF No. 45.)   The Court will not require Plaintiff to do so for his briefs related to the present motion. However, Plaintiff and his counsel are advised that the most helpful citation format for the Court is to cite to the name of the document referenced, the page number, and the docket number, e.g., (Pl's Dep. PageID 167, ECF No. 33-4.)

[25]  Q. I'm just trying to get a general understanding that when you used that pipe wrench to adjust the joy nut, that, in fact, what you were doing was adjusting the movement of the drive shaft on the press. And by adjusting the drive shaft, you were impacting how far up or down the press went and whether it operated properly or not.

A. Yes, sir.

(*Id.* at PageID 187.)

adjustment without locking-out/tagging-out and had been performing these adjustments for almost three years that way. (*Id.* at PageID 185, 197, 209.) When Plaintiff could not get the gearbox adjusted, he called his team leader, Matthew White, for assistance. (*Id.* at PageID 189.) White climbed on the press with Plaintiff and attempted the same adjustment without being locked-out/tagged-out. (*Id.* at PageID 194 - 196.)

Jeff Gaston told Plaintiff that he was fired because CSG had a zero tolerance policy for LOTO violations. (*Id.* at PageID 273.) Prior to this incident, Plaintiff had never been told that there was zero tolerance for LOTO violations. (*Id.* at PageID 275.) When Plaintiff pointed out that White had "done the same thing" that Plaintiff had on press 72, Gaston stated that there would be an investigation concerning White's actions. (*Id.*)

White admitted that, if Plaintiff's description of his actions in connection with working on press 72 were true, then White would have violated the LOTO policy. (White Dep. PageID 1482, ECF No. 33-9.) White was never asked by his supervisors if he had violated the LOTO policy. (*Id.* at PageID 1479.)

From this evidence, if believed, the trier of fact could find that Plaintiff's work on press 72 was an adjustment that fit within the LOTO exception and that Defendant did not, in fact, have a zero tolerance policy for LOTO violations in that White was not also terminated.

Plaintiff has also pointed to evidence that, when he returned from FMLA leave in 2015, he limped a little and walked more slowly but still was able to do his job. (Pl's Dep. PageID 289, ECF No. 33-4.) After about two weeks, Ronnie Owens, engineering services manager, called Plaintiff to his office and had the following conversation with him.

> He said, "Well, Chuck," he said -- he said, "You know," he said, "I've got a place I've been thinking about putting you." He said -- he said, "It's totally up to you." He said, "I ain't going to do nothing unless you say yes" He said, "But I'd

like to see you, you know, make retirement and everything." He said, "You know, with your age and," he said, "the condition, you know, of your legs and everything you've got going on" -- and he said, "I know your wife has a little problem."

He said, "I've been thinking about" -- he said, "You'll have to take a decrease in pay." He said, "But I've been thinking about moving you to -- back there in the machine shop," where it would have been, "cleaning molds."

And I said, "Well" -- I said, "Well, why is that, Ronnie?"

He said, "Well," he says, "I just don't think you're going to make it in maintenance." He said, "I don't think your level of skills is where it should be at." He said, "But I'd like to see you retire." And he said -- he said, "You're going to have trouble, Chuck." He said, "Let's face it." He said, "It's going to be hard for you to find work somewhere else as old as you are and with the condition your health is in, finding a good-paying job, Chuck." He said, "Now," he said, "you'll have to take a cut in pay."

(*Id.* at PageID 301-303.)

Plaintiff refused the job offer because he could not afford to take a pay cut. (*Id.*) Although Owens did not make the final decision to terminate Plaintiff, it is undisputed that Gaston relied on Owens's input in making that decision. Evidence that Owens did not believe that Plaintiff could do his job because of his age and/or disability coupled with evidence that Plaintiff's work on press 72 fell into an exception to the LOTO policy, if believed by the trier of fact, could lead to a finding that Defendant's stated reason for firing Plaintiff was a pretext for illegal discrimination.

Defendant has countered that, even if Plaintiff did not actually violate the safety rule and even if Defendant made a "mistake" in its investigation (Def's Reply p. 26, ECF No. 41), it held an honest and reasonable belief that Plaintiff had violated the rule and should be terminated.

The honest-belief rule is, in effect, one last opportunity for the defendant to prevail on summary judgment. The defendant may rebut the plaintiff's evidence of pretext, by demonstrating that the defendant's actions, while perhaps "mistaken, foolish, trivial, or baseless," were not taken with discriminatory intent. [Courts] give the defendant an opportunity to show that its intent was pure, because "the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it

        relied upon in making its employment decision, then the employer arguably lacks
        the necessary discriminatory intent."

*Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714–15 (6th Cir. 2007) (citations omitted).

Thus, "[w]hen an employer reasonably and honestly relies on particularized facts in making an

employment decision, it is entitled to summary judgment on pretext even if its conclusion is later

shown to be 'mistaken, foolish, trivial, or baseless.'" *Tingle*, 692 F.3d at 531 (quoting *Chen*, 580

F.3d at 401).  The "key inquiry ... is 'whether the employer made a reasonably informed and

considered decision before taking' the complained-of action."  *Id.* (quoting *Michael v.

Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007)).  Although the employer

must point to particularized facts on which it reasonably relied, the Sixth Circuit does "not

require that the decisional process used by the employer be optimal or that it left no stone

unturned."  *Id.*; *Michael*, 496 F.3d at 599; *see also Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d

274, 285 (6th Cir. 2012) (reiterating that an employer need not demonstrate that its investigation

was "optimal or that it left no stone unturned").  To rebut an employer's reliance on the rule, the

plaintiff must offer some evidence of "an error on the part of the employer that is too obvious to

be unintentional." *Id.* at 286.  "[W]hen the employee is able to produce sufficient evidence to

establish that the employer failed to make a reasonably informed and considered decision before

taking its adverse employment action, thereby making its decisional process unworthy of

credence, then any reliance placed by the employer in such a process cannot be said to be

honestly held."  *Jones v. Nissan N. Am., Inc.*, 438 F. App'x 388, 403 (6th Cir. 2011).

        In the present case, Plaintiff has pointed to evidence which, if believed, would allow the

trier of fact to find that Defendant did not have an honest and reasonable belief that he violated

the LOTO safety rule policy and, instead, was terminated because of his age and/or perceived

disability. The trier of fact could find that the incident occurred around 4:00 p.m., on February 4, 2016, and the decision to terminate Plaintiff was made prior to 5:30 p.m. on that same day. Corey McLemore testified in his deposition that he wrote up a corrective action notice recommending that Plaintiff be fired within an hour after the incident and prior to receiving Plaintiff's statement concerning the incident and even though he had not himself witnessed the incident.[26] (McLemore Dep. PageID 1269-1270, 1272-1273, 1279, ECF No. 33-8.)[27] In making his recommendation, McLemore relied on the statements of Matthew White as to what had occurred, although he did not ask White if he himself had violated the policy by working on the machine without locking-out/tagging-out. McLemore described this as "a one-sided conversation" with White as to what had occurred. (*Id.* at PageID 1314.)

> Q. If Mr. Bland's testimony is correct in that the very same task that Mr. Bland attempted that Matthew White attempted after he got there as well to see if he could adjust it as well, if that is true, would Mr. White have been in violation of that policy, in your opinion?
>
> A. Yes, if that's true.
>
> Q. Okay. Did you ask Mr. White if he had worked on the machine?

---

[26] McLemore did not have the authority to terminate an employee but could make a recommendation for termination. (Gaston Dep. PageID 576, ECF No. 33-5.) As previously noted, Gaston relied, in part, on McLemore's recommendation in making the decision to terminate Plaintiff.

[27] Q. Okay. Did you -- were you recommending that Mr. Bland be terminated when you filled out this document?

A. Yes, ma'am.

Q. Okay. So am I safe to conclude that you had made up your mind by the time this was complete? Correct?

A. Yes, ma'am.

(*Id.* at PageID 1272.)

A. No, ma'am, not at the time.

(*Id.* at PageID 1272.)   Although McLemore did not ask White whether he worked on the machine, he observed him standing on the machine with Plaintiff.  (*Id.* at PageID 1313.)

Plaintiff has also pointed to evidence from which the trier of fact could find that Ronnie Owens signed the corrective action notice at the same time that McLemore signed it, thus leading to the inference that neither McLemore nor Owens allowed Plaintiff to tell his version of the events before recommending termination.

Q.  Did Mr. Owens sign [the form] the same time that you did?

A.  Okay. Was Mr. Owens' mind made up as well on the 4th?

A.  I can't speak for him.

Q.  Okay. Well, if he signed this, he didn't indicate that anything on here he disagreed with. Correct?

A.  Yes, ma'am.

(*Id.* at PageID 1273-1272.)

Even though Defendant contends that it has a "zero tolerance provision" in the LOTO policy, there is no such explicit provision in the policy.  (*Id.* at PageID 1288.)

On February 4, Owens asked White to write a statement about the events concerning Plaintiff and the purported LOTO policy violation.  (White Dep. PageID 1451, ECF No. 33-9.) On February 5, White wrote a version of the event with more details at the request of Jeff Gaston.  (*Id.* at PageID 1454-1455, 1458.)   If Plaintiff's description of White's actions in connection with working on press 72 is accurate, then White would have violated the LOTO policy.  (*Id.* at PageID 1482.)  White was never asked if he had violated the LOTO policy.  (*Id.* at PageID 1479.)

Jeff Gaston made the final decision to terminate Plaintiff based on a "collaborative effort," including talking to Owens. (Gaston Dep. PageID 602, 33-5.) Gaston told McLemore to fill out the corrective action notice on February 4 although he does not remember if he told McLemore to put the word "termination" on it. (*Id.* at PageID 604.) Gaston relied on McLemore, Owens, and White to explain to him that Plaintiff had violated the LOTO policy. (*Id.* at PageID 609-610.) The LOTO policy allows for certain exceptions to the policy by stating "It is recognized that there are certain servicing operations which, by their very nature, must take place without de-energization, such as operational testing of machinery or equipment, sampling, tooling changes and adjustments which take place during normal production." (*Id.* at PageID 616.) McLemore, Owens, and White did not discuss any possible exceptions to the LOTO policy with Gaston even though they reviewed Plaintiff's training file and the file contained certain exceptions to the LOTO Policy. (*Id.* at PageID 613-615.)

Neither White nor McLemore nor Owens told Gaston that "at some point" both White and Plaintiff were on top of press 72. (*Id.* at PageID 631.) The following day, Plaintiff told Gaston that White had attempted the same action that he had attempted on press 72, and Gaston replied that "the investigation had been completed and that everyone was -- was -- that it had been completed appropriately and that everyone was – basically was dealt with appropriately as well." (*Id.* at PageID 690.)

Gaston was aware that Plaintiff had difficulty walking and authorized Owens to offer Plaintiff another position that would require less walking but paid less than Plaintiff's then position. (*Id.* at PageID 639-641.)

Other employees had not been terminated despite violating the LOTO policy. (Goodman Dep. PageID 1573, ECF No. 35-3.)[28]

In light of this evidence, the Court finds that there are material issues of disputed fact as to whether Defendant's investigation into the incident was merely flawed and that Defendant held an honest and reasonable belief that Plaintiff had violated the LOTO policy and should be terminated on this ground or whether Defendant's investigation was a pretext for age and/or disability discrimination. Therefore, Defendant's motion for summary judgment must be denied.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: April 13, 2018

---

[28] Defendant's explanation for the varying levels of discipline is that safety measures were more strictly enforced after Thomas Lents was hired as the environmental health safety manager. (Def's Reply p. 26 n. 23, ECF No. 41.) The reason for the disparity in levels of discipline is a question for the trier of fact.